# Exhibit 1

1

MC GINNIS & ASSOCIATES, INC.
614.431.1344    COLUMBUS, OHIO    800.498.2451
www.mcginniscourtreporters.com

1                          UNITED STATES DISTRICT COURT
                               DISTRICT OF CONNECTICUT
2
                                          - - -
3
  Nationwide Mutual Insurance        )
4 Company, et al.,                   )
                                     )
5            Plaintiffs,             )
                                     )
6       vs.                          )   Civil No.:  3:99CV2007 (RNC)
                                     )
7 Bruce J. Mortensen,                )
                                     )
8            Defendant.              )

9                                         - - -

10  Nationwide Mutual Insurance       )
   Company, et al.,                   )
11                                    )
             Plaintiffs,              )
12                                    )
        vs.                           )   Civil No.:  3:99CV2006 (RNC)
13                                    )
   David Donaldson,                   )
14                                    )
             Defendant.               )
15
                                          - - -
16
   Nationwide Mutual Insurance        )
17 Company, et al.,                   )
                                      )
18            Plaintiffs,             )
                                      )
19       vs.                          )   Civil No.:  3:99CV2005 (RNC)
                                      )
20 Patricia Bland,                    )
                                      )
21            Defendant.              )

22                                        - - -

23              VIDEOTAPE DEPOSITION OF GALEN BARNES

24                    THURSDAY, OCTOBER 11, 2001

25                        8:35 O'CLOCK A.M.

MC GINNIS & ASSOCIATES, INC.
614.431.1344    COLUMBUS, OHIO    800.498.2451
www.mcginniscourtreporters.com

36

1     Q.    Who first coined the word "defections" as it would

2     apply to agents in the State of New York leaving Nationwide?

3     A.    I do not know.

4     Q.    Has -- Have you ever heard of agents in the State of

5     New York who have left Nationwide called defectors?

6     A.    Yes.

7     Q.    And what does the word "defector" mean to you, sir?

8     A.    In this particular instance, what it means is an

9     individual terminating their agreement and going to work for a

10    competitor.

11    Q.    Okay.  And is that -- That is called a defection in

12    your terminology?

13    A.    In this specific area, yes.

14    Q.    Okay.  Has -- Have you ever heard of these people

15    called anything other than defectors?  And by "these people", I

16    mean those agents from the State of New York who have left

17    Nationwide to go to work for other insurance companies.

18    A.    Yes, I've heard them referred to by their first names,

19    by their first and their last names, by many other terms as we

20    would normally use in conversation language as to referring to

21    individuals which -- for which we have relationships with our

22    company.

23    Q.    Have you ever heard of them referred to as traitors?

24    A.    No.

25    Q.    Have you ever heard of them referred to as enemies of

MC GINNIS & ASSOCIATES, INC.
614.431.1344    COLUMBUS, OHIO    800.498.2451
www.mcginniscourtreporters.com

61

1    whether or not the particular loss ratios of individual

2    agents -- agents are better than or worse than the projections

3    for the company as -- as a whole?

4        A.    Yes, we do.

5        Q.    And do you know whether or not Robert York's

6    performance during the last 10 years of his career with

7    Nationwide was better than or worse than the annual loss ratios

8    that were applied by the company to business as a whole?

9        A.    I do not know that detail, but it would be my

10    expectation that members of my team would, but I do not have

11    that detail.

12        Q.    Okay.  Do you know whether any of the people who --

13    who have been sued in Connecticut had loss ratio performances

14    that were worse than the combined loss ratios applicable to

15    business as a whole in each particular year that they were

16    agents?

17        A.    I do not know.

18        Q.    Okay.  Has there been any decision on the part of

19    Nationwide to consolidate agencies in order to create fewer but

20    bigger agencies?

21        A.    Yes.

22        Q.    And when was that -- when was that policy first

23    adopted?

24            MS. FREEMAN:  Objection as to form.

25            Go ahead, please.

1    Q.   How about the change in -- in compensation?  Did the

2    change in compensation to agents have anything to do with the

3    departure of agents in the northeast?

4    A.   I -- I do not know.  I can speculate -- speculate tha

5    it did, but I do not know.

6    Q.   Well, have -- have you had any occasion to sit down

7    with agents who are -- who -- who have left to try to find out

8    from them "Why did you leave"?

9    A.   Not -- I did not do that personally, no.

10    Q.   All right.  Have you had any communications from

11    agents explaining to you the circumstances that have caused them

12    to leave?

13    A.   I've had conversations with various agents, some of

14    which may have left, about the concerns they had about cash flow

15    and things of that nature.

16    The company in late 1999, for example, recognizing the

17    challenges of the service issues and the compensation changes

18    paid a loyalty bonus to all of our agents in order to help them

19    with their cash flow, and those were the result of conversations

20    with several agents.  I'm not sure if it included any of these

21    particular agents or not, because I do not recall whether they

22    were involved in those conversations or input sessions.

23    Q.   Do you know whether or not there was a change in

24    commission rates --

25    A.   Yes.

MC GINNIS & ASSOCIATES, INC.
614.431.1344    COLUMBUS, OHIO    800.498.2451
www.mcginniscourtreporters.com

7

1    Q.    -- commencing in -- And when did the change in

2    commission rates commence?

3    A.    I have a vague recall, and somebody probably should

4    confirm it for you, but I believe it actually hit in January of

5    1999, but I -- I would -- I would not want you to hold me

6    precisely to that without checking.

7    Q.    Did you have any communications with Nationwide agents

8    who indicated that as a result of the change in commission rates

9    coupled with the marketability of the products provided that

10   they were suffering substantial economic hardship?

11   A.    Yes.

12   Q.    Okay.

13   A.    Now, again, I want to make sure I understand your

14   question.

15   Q.    Yes.

16   A.    I do not recall if it was from these specific agents,

17   but in general, yes.

18   Q.    Did you ever remember a fellow by the name of Steven

19   Caulwin?

20   A.    No, I do not.

21   Q.    C-a-u-l- -- I apologize.  I may have misstated his

22   name, sir.  Let me -- Let me pass on that and I'll -- I'll come

23   back to that.

24        With respect to the -- Exhibit 6 -- All right.  Do you

25   know whether or not the loss ratios that you projected for 2001

7:

1      A.    About 108, I believe, somewhere in that area.

2      Q.    And what number have you projected for the year 2001?

3      A.    We've got a lot of praying going on that we don't get

4  a hurricane in the next three weeks, and assuming that we don't,

5  the actual numbers should come in, we believe, at about 104.5.

6            There will be a half a point added to that because

7  we're going to be extending a special payment to our agents for

8  a profit bonus this year of 35 million, which will take it, we

9  think, pretty close to 105 combined.  And our target this year

10  was 106.  So we're feeling like we've made some good progress

11  this year.

12     Q.    The -- There -- I -- There has been a reference -- No,

13  I apologize.  Let -- Let me just ask a question not a statement.

14            Is Nationwide a 117 billion Fortune 500 insurance and

15  financial service organization?

16            MS. FREEMAN:  Objection as to form.

17            Go ahead, please.

18            THE WITNESS:  Actually, that sounds like a writing of

19  some vintage.  As I recall, the total assets in all of the

20  Nationwide companies, including the ones we're talking about

21  today, are in excess of 200 billion.

22  BY MR. HENNESSEY:

23     Q.    Okay.  And what -- what do those assets consist of?

24     A.    Actually, most of them are the assets of our customers

25  who buy mutual funds and things of that nature for us.  A lot of

MC GINNIS & ASSOCIATES, INC.
614.431.1344    COLUMBUS, OHIO    800.498.2451
www.mcginniscourtreporters.com

1    Q.    All right.  And how many, if any, had "defected" as of

2    July 19, 1999?

3    A.    That as exhibited at the time of the writing of this

4    memo in New York, for example, there were 10 agents who had

5    resigned and that decided to compete with us with other

6    companies.

7    Q.    How many of the 10 were sued?

8    A.    I do not know.

9    Q.    Is it correct that 28 agents -- as of July 19, 1999,

10    28 agents had left in Pennsylvania?

11    A.    That is correct.

12    Q.    How many of them were sued?

13    A.    I do not know.

14    Q.    Did you have any participation in -- in the decision

15    as to whether or not to sue?

16    A.    We had a general discussion as to our strategies,

17    again, as I responded to the earlier question.  So yes, I was

18    involved in that.

19    Q.    Okay.  And what -- Did you participate in the adoption

20    of criteria to be applied to the determination of whether an

21    agent who left and competed would be sued or would not be sued?

22    A.    No.

23    Q.    Do you know whether there were any lawsuits that had

24    been commenced as of July 19, 1999?

25    A.    I do not recall.

MC GINNIS & ASSOCIATES, INC.
614.431.1344    COLUMBUS, OHIO    800.498.2451
www.mcginniscourtreporters.com

8

1    yesterday -- yesterday with me by my attorneys.

2        Q.    But do you have no recollection of -- of receiving it

3    at -- at or about August 2, 1999?

4        A.    And I -- I don't recall.  I could speculate, since I

5    am not shown as a recipient, that I did not receive it.

6        Q.    The first -- The upper portion of the first page makes

7    reference to Galen had a team brainstorm to ensure that we do

8    everything possible to prevent and/or correct the defection

9    problem.

10           Do you remember such a team brainstorm?

11       A.    Again, when you talk about "team", we -- as I

12   responded to an earlier question, I don't recall a specific team

13   that -- that was formed, but these were people that were

14   responsible in the various areas to determine if there were

15   practices, or strategies, or policies beyond our normal

16   activities in order to retain the customers and to hopefully

17   slow down and stop the number of agents departing to go work for

18   our competitors.

19       Q.    All right.  I think one of the suggestions -- or,

20   in the -- on the first page, Item 4, says, "Kates to recommend

21   whether it is a good strategy to recruit market reps from

22   Kemper, Erie".

23           Do you know whether that strategy was implemented?

24       A.    I don't believe it was, but I don't know.

25       Q.    Was there a -- Was it a practice of Nationwide in 1999

MC GINNIS & ASSOCIATES, INC.
614.431.1344    COLUMBUS, OHIO    800.498.2451
www.mcginniscourtreporters.com

9

1    to recruit market representatives from other insurance

2    companies?

3         A.    We have a fairly extensive recruiting strategy, as far

4    as getting quality people in the organization and, hopefully, a

5    lot of cases our -- our employees are promoted from other

6    assignments, and sometimes we cannot find someone who's

7    qualified so we go outside the company to find them.

8         Q.    And to what other insurance companies do you go from

9    time to time to find market representatives?

10        A.    Generally, it would be just whomever.  It could be

11    anyone.

12        Q.    All right.  Now, when you speak of recruiting market

13    representatives, would -- would that be -- include persons who

14    were agents, insurance agents, for these other companies?

15        A.    Again, I don't believe we implemented this, but as I

16    would understand the term, market reps would be employees of an

17    organization.  They're not agents, they are management and

18    relationship builders with agents.

19        Q.    Are you aware of the fact that Nationwide from time to

20    time in or prior to -- in and prior to 1999 would recruit agents

21    who were agents for other insurance companies?

22        A.    As a general practice, we have not done that, no.

23        Q.    Has -- Whether it was a general practice or not, was

24    it done from time to time?

25        A.    I -- I don't know.

MC GINNIS & ASSOCIATES, INC.
614.431.1344    COLUMBUS, OHIO    800.498.2451
www.mcginniscourtreporters.com

1    Q.    When people came from other companies to Nationwide,

2    were they referred to as defectors from the other company?

3    A.    Again, I don't recall us doing it, so it would be hard

4    for me to respond to your question.

5    Q.    The first item in the -- in the document which has

6    been marked Exhibit 10 makes reference to "...a piracy clause

7    for new agents effective ASAP".

8    What, to your understanding, was being referred to in

9    that memo?

10    MS. FREEMAN:  Objection as to form.

11    Go ahead, please.

12    THE WITNESS:  We periodically review the agency

13    agreements of our competitors and we were aware at this time

14    that the language used by some of our major competitors had

15    clauses in them that had different language than our -- than our

16    own dealing with the issue of the loss of business, the

17    competition for business and so on.  So that's what it refers

18    to.

19    BY MR. HENNESSEY:

20    Q.    Okay.  Well, when it speaks of piracy, what did you

21    understand to be an act of piracy?

22    A.    Again, it's a fairly loose term.  It specifically

23    defines or uses different language to define what happens at the

24    time of the departure.  It's not really a noncompete provision,

25    but it could be considered to be of some general area in that

MC GINNIS & ASSOCIATES, INC.
614.431.1344      COLUMBUS, OHIO      800.498.2451
www.mcginniscourtreporters.com

1    regard, but it's specific language used for sure, or was, last

2    time I was aware, by State Farm in their -- in their contracts.

3         Q.    Okay.  Now -- And was it -- Were you aware that as of

4    July 1999 there was no such piracy clause provisions in the

5    contracts that were in effect with agents of Nationwide

6    throughout the country?

7         A.    That is not correct.  We had language in the policy

8    that we believe is fairly clear as to the ownership rights to

9    the -- to the customer, what happens in the case of a

10   resignation or termination of an agent.  Again, as we continue

11   to look at how other companies deal with the same issues,

12   particularly exclusive agency companies, the languages are

13   different from company, and we look at them periodically to --

14   to make sure that we understand what's going on in the

15   marketplace.

16        Q.    So is it your understanding that as of 1999 the

17   contracts that were in effect then with agents included within

18   them the provisions that it would make it improper for a

19   departing agent to solicit a customer to come with him?

20        A.    That is my understanding.

21        Q.    Okay.  Now --

22        A.    In fact, again, in order to be precise, I mean, if --

23   if the agent decided to solicit those, stay within a 25-mile

24   radius of their current location, they -- what they lost for

25   doing that, and again, there's different provisions based upon

MC GINNIS & ASSOCIATES, INC.
614.431.1344    COLUMBUS, OHIO    800.498.2451
www.mcginniscourtreporters.com

1   the tenure of the agent and so on, then they would lose their

2   rights to the deferred compensation and the extended earnings

3   that they would have qualified for beforehand.

4       Q.   But if they lost their rights to the deferred

5   compensation and extended earnings, would they not then be free

6   to solicit their customers?

7           MS. FREEMAN:  Objection as to form.

8           Go ahead, please.

9           THE WITNESS:  Again, that's a legal issue.  My

10  understanding of the practice, yes, they would solicit those.

11          The question from my observation and my understanding

12  of the business is how and whether they could use proprietary

13  records that we believe are owned by Nationwide to do so.

14  BY MR. HENNESSEY:

15      Q.   All right.  When did Nationwide first come to any

16  awareness that it -- that agents had in their possession

17  "proprietary records"?

18          MS. FREEMAN:  Objection as to form.

19          Go ahead.

20          THE WITNESS:  I don't mean to be flippant in my --

21  with my answer, but when we gave it to them.

22  BY MR. HENNESSEY:

23      Q.   I see.

24          And what did you give to Bob York with respect to any

25  particular person that he sold an automobile policy to?

MC GINNIS & ASSOCIATES, INC.
614.431.1344    COLUMBUS, OHIO    800.498.2451
www.mcginniscourtreporters.com

99

1    BY MR. HENNESSEY:

2        Q.    And how many -- How frequently on a weekly basis would

3    you receive some form of update with respect to agent

4    defections?

5        A.    I do not know.

6        Q.    How -- How frequently -- Do you know whether or not

7    you would meet at least once a month with other officers of the

8    company for the purpose of discussing agent defections?

9        A.    Again, I don't recall.  That would not surprise me.

10    It was probably more frequently than once a month during this

11    period of time, but I don't recall specifically.

12        Q.    Did you have a group of persons that were known as

13    your cabinet?

14        A.    Yes.

15        Q.    And in -- in August of 1999, what persons comprised

16    your cabinet?

17        A.    If we go back, I believe, to Exhibit 1 that we

18    reviewed earlier, it would be those people who directly reported

19    to me.

20        Q.    Okay.  And would that be all of the persons on the --

21    on the first line below your -- your name, sir?

22        A.    Yes.

23        Q.    Okay.  The next document I'd like to show you, sir, is

24    this -- this document and --

25            MS. FREEMAN:  Thank you.

MC GINNIS & ASSOCIATES, INC.
614.431.1344    COLUMBUS, OHIO    800.498.2451
www.mcginniscourtreporters.com

130

1    Thereupon, Defendants' Exhibit No. 22 was

2    marked for purposes of identification.

3                        - - -

4    MS. FREEMAN:  I'm sorry, is this 22, Mr. Hennessey?

5    MR. HENNESSEY:  I believe it would be.  Am I correct?

6    THE REPORTER:  Yes.

7    MS. FREEMAN:  Thank you.

8    MR. HENNESSEY:  Yes.

9    (Pause.)

10   THE WITNESS:  I don't recall seeing it.

11   BY MR. HENNESSEY:

12   Q.    Okay.  The document indicates that it came from an

13   Edward Cooper.  Who is Edward Cooper?

14   A.    He's currently the field officer that's responsible

15   for the service center in Raleigh, North Carolina.

16   Q.    Does -- Is the Reflex Action Plan still in effect?

17   A.    Yes, I believe so.

18   Q.    Is Mr. Cooper involved in any way in the Reflex Action

19   Plan as of today?

20   A.    Yes, he would be.  If there were any agents that were

21   defecting that were located in the states that he would serve,

22   his -- his unit would be responsible for making contact with the

23   customers and things of that nature.

24   Q.    All right.  Now, do you know whether or not the

25   suggestion in Mr. Cooper's memorandum of March 5, 1999 ever

1    became a part of the Reflex Action Plan?

2        A.    No, I do not.

3        Q.    Okay.    I'll show you this document, which we will mark

4    23, Mr. Barnes.

5            MS. FREEMAN:    Thank you, Mr. Hennessey.

6            MR. HENNESSEY:    You're welcome.

7                                - - -

8            Thereupon, Defendants' Exhibit No. 23 was

9            marked for purposes of identification.

10                               - - -

11           (Pause.)

12           THE WITNESS:    Okay.

13    BY MR. HENNESSEY:

14       Q.    Yes, sir.

15           And is -- This document dated July 6, 1998 and -- and

16    it indicates it's from a Sharon D. Massie.

17           Can you tell me what, if any, position Sharon D.

18    Massie held in the Nationwide -- with Nationwide as of that

19    date?

20       A.    She would have been in the -- She would have been a

21    secretarial individual working in Mr. Jim Taylor's office at

22    that time.

23       Q.    Now, it indicates that there -- that Mr. Crumrine is

24    identified as the primary coordinator of the communication to

25    agents on inappropriate communications.

MC GINNIS & ASSOCIATES, INC.
614.431.1344      COLUMBUS, OHIO      800.498.2451
www.mcginniscourtreporters.com

132

1            Did he hold such a title?

2      A.    Not that I'm aware of.  It was part of his job

3  responsibilities.

4      Q.    Okay.

5      A.    Again, let me put it into context.  I'm not sure.

6  This is vague recall.  We had come out during this period of

7  time with a new logo, which is a frame, and as a joke some of

8  our agents had decided to put the pictures of naked women inside

9  the frame and communicate it around the organization, which

10 obviously was offensive to several employees in our

11 communication system, and -- so some discussion and reprimand of

12 individuals along that line occurred, which in our view is very

13 inappropriate behavior.

14            Now, I don't know -- Again, I'm speculating because I

15 don't know if that was specifically related to this particular

16 item or not.

17     Q.    Okay.  Do you recall any other kind of inappropriate

18 communications that might have been going on back on July 6th,

19 1998 other than depictions of nude women in -- in the company

20 logo?

21     A.    No, I do not.

22     Q.    Okay.  Do you know that -- The inappropriate

23 communication, do you know that -- that your company brought

24 action against Mr. Frazier?

25     A.    Yes, I am.

MC GINNIS & ASSOCIATES, INC.
614.431.1344    COLUMBUS, OHIO    800.498.2451
www.mcginniscourtreporters.com

1          Q.    And do you -- Are you aware that the inappropriate

2     communications was his -- his communications with other agents

3     of Nationwide?

4               MS. FREEMAN:  Objection as to form.

5               Go ahead, please.

6               THE WITNESS:  Yes.

7     BY MR. HENNESSEY:

8          Q.    Okay.  And are you aware that those communications had

9     nothing to do with naked women or -- or --

10         A.    I doubt -- or, I assume they -- they would not.

11    Again, my -- my recall, when, you know, you get into the

12    language, we occasionally communicate to both employees and

13    agents and it sometimes takes more serious action than that in

14    terms of inappropriate communications.  Again, I -- my recall as

15    to the specific nature of this communication is not good.

16         Q.    Okay.  The -- The document -- The document talks of a

17    strategic meeting file.  Do you know what the strategic meeting

18    file was?

19         A.    No.

20         Q.    Okay.  Do you know who maintains if -- if such a file

21    exists -- Well, you don't know that such a file exists, correct?

22    So I won't --

23         A.    That's correct.

24         Q.    I won't ask you then the next question because it will

25    be argumentative.

MC GINNIS & ASSOCIATES, INC.
614.431.1344    COLUMBUS, OHIO    800.498.2451
www.mcginniscourtreporters.com

134

1          The -- I would like to show you this document, if I

2    could, please.  Oh, I'm sorry.

3          MS. FREEMAN:  Thank you, Mr. Hennessey.

4          MR. HENNESSEY:  Yeah.

5                              - - -

6          Thereupon, Defendants' Exhibit No. 24 was

7          marked for purposes of identification.

8                              - - -

9          MR. HENNESSEY:  This would be -- excuse me -- 24?

10         THE REPORTER:  Yes.

11         MR. HENNESSEY:  Okay.

12         (Pause.)

13    BY MR. HENNESSEY:

14        Q.   Can you --

15         MS. FREEMAN:  One second, please.

16         MR. WHITE:  No, you can -- you can go ahead.  I'll get

17    it.

18         MS. FREEMAN:  Okay.  We'll go ahead.

19    BY MR. HENNESSEY:

20        Q.   All right.  Do you -- Do you recognize the document

21    that is -- has been identified as 24, Exhibit 24?

22        A.   No, I do not.

23        Q.   All right.  Do you know whether there was any one

24    person or -- or -- or group of persons who were charged with the

25    responsibility of preparing documents on the subject matter of

MC GINNIS & ASSOCIATES, INC.
614.431.1344    COLUMBUS, OHIO    800.498.2451
www.mcginniscourtreporters.com

135

1    Defense to Agency Acquisitions?

2        A.    No, I do not.

3        Q.    The -- I'd like to show you this document, sir, and --

4        MS. FREEMAN:  Thank you, Mr. Hennessey.

5        MR. HENNESSEY:  You're welcome.

6        This will be Exhibit 25.

7                                    - - -

8        Thereupon, Defendants' Exhibit No. 25 was

9        marked for purposes of identification.

10                                   - - -

11       MS. FREEMAN:  Oh, how nice.  Did you want something

12   else to drink?

13       THE WITNESS:  (Witness shook head.)

14       (Pause.)

15       MR. HENNESSEY:  Oh, I'm sorry.

16   BY MR. HENNESSEY:

17       Q.    Did -- Did you ever see this document previous to

18   today, Mr. Barnes?

19       A.    Not that I recall.

20       Q.    All right.  It -- Do you know who Mr. Eyster is?  Did

21   I pronounce his name correctly, Eyster?

22       A.    Yes, you have.

23       Q.    Who was he back on June 19th, 1999?

24       A.    He was the -- one of the managers in the service

25   center in Harrisburg, Pennsylvania.

MC GINNIS & ASSOCIATES, INC.
614.431.1344    COLUMBUS, OHIO    800.498.2451
www.mcginniscourtreporters.com

13

1    Q.    Okay.  And he -- he was sending this action plan,

2    apparently, to Mr. Leo; is that correct?

3    A.    That's what it appears to be on the --

4    Q.    Yeah.

5    A.    -- on the memo, yes.

6    Q.    Mr. Leo, I think you previously indicated, would have

7    been his superior?

8    A.    No.

9         MS. FREEMAN:  Objection as to form.

10   BY MR. HENNESSEY:

11   Q.    Oh, I'm sorry.

12        What -- What was the relationship of Mr. Leo to

13   Mr. Eyster as of June 1999?

14   A.    Mr. Leo would have been in the Office of Agency and

15   Mr. Eyster would have been in the cen- -- service center.  So

16   they were colleagues, but not in the same organizational direct

17   reporting relationship.

18   Q.    Is Mr. Eyster still with the company?

19   A.    Yes, I believe he is.

20   Q.    Okay.  And in what capacity?

21   A.    I believe he's still working in the service center,

22   but I'm not sure.

23   Q.    Okay.  Do you know why the memo indicates that -- that

24   it should not be shared any further?

25   A.    No, I do not.

MC GINNIS & ASSOCIATES, INC.
614.431.1344    COLUMBUS, OHIO    800.498.2451
www.mcginniscourtreporters.com

1     Q.    Okay.  In the -- In the document itself, it calls for

2    "A memo from Galen Barnes" -- and I'm -- I'm -- I'm turning now

3    to what's Page 5 of the document -- "A memo from Galen Barnes to

4    agencies -- to agents guaranteeing that we will continue to

5    honor our DCIC obligations will be sent", and then it says below

6    it, "Communication was sent".

7        Do you recall that you did that?

8    A.    I don't recall the specific date.  And again, to put

9    it into context, some of our competitors who were approaching

10    our agents were indicating to them since the DCIC plan was not

11    funded the company could eliminate it at any time, so the loss

12    of that money was not as big an issue as Nationwide may have

13    been suggesting to them.  So we felt it was appropriate to

14    communicate to our agents that we had no intentions of changing

15    our policy at -- at the time of this activity to change the way

16    we proceeded with our DCIC and extended -- extended earnings

17    program.

18    Q.    The second page of the document, the first page of the

19    summary, at -- Objective One indicates, "To retain our

20    policyholders and to prevent substantial loss of premium to

21    Nationwide and to demonstrate to all agents that defecting is

22    not financially beneficial to them".

23    A.    I'm sorry, you're on the summary?

24    Q.    Yes, sir, on the second page.  It would be the --

25    A.    Yes, I see --

MC GINNIS & ASSOCIATES, INC.
614.431.1344    COLUMBUS, OHIO    800.498.2451
www.mcginniscourtreporters.com

138

1    Q.    -- second page of the document.

2    A.    I see that.

3    Q.    Objective One.

4    A.    I see that, yes.

5    Q.    Yes.

6    "...to demonstrate to all agents that defecting is not

7    financially beneficial to them."

8    Do you ever recall any discussions as to how the

9    company could best demonstrate to all agents that defecting is

10   not financially beneficial to them?

11   A.    Yes.

12   Q.    And how -- how was -- What were -- was your

13   understanding of the methodology or methodologies to be used to

14   accomplish that goal?

15   A.    It was primarily on the issue of retention.  We kept

16   track -- Part of the reporting process on the Reflex Action

17   Program was keeping track of how many customers Nationwide

18   retained after the agent departed, and we felt and went to the

19   part of doing some calculations so our sales manager could share

20   it with our agents to the effect that if the company retained

21   over 60 percent of the customers, even if our competitors were

22   offering to increase the amount of commissions and things of

23   that nature with the retention by the agent of only 40 percent

24   of the customers, would result in a significant loss of income

25   and, therefore, not in their financial benefit to consider.

MC GINNIS & ASSOCIATES, INC.
614.431.1344    COLUMBUS, OHIO    800.498.2451
www.mcginniscourtreporters.com

139

1  Q. Okay. Can you tell whether or not parts of this memo

2 have been whited out?

3  A. Again, if you go to the first page of the document,

4 again, it's just the way our Lotus Notes system works.  Going

5 back to an earlier response I gave, you see the little box down

6 at the bottom of the first page indicating that there is an

7 attachment.

8  Q. I see.

9  A. And then the way the system works, it leaves that --

10 the rest of the page blank because the attachment then, this

11 goes with the sentence.

12   Looking at the attachment itself, it appears to me

13 that Page 1 or 2 of the document would be normal, with our

14 normal way that things print out on our e-mail system.

15   Page on policyholder service plans would appear the

16 same as far as what's here and the spacing that's occurred.

17   Page 4, again, would not be uncommon with what you

18 would see on a normal attachment to one of our e-mails.

19   Page 5 is hard to see how any more typing could have

20 been provided, so I doubt it on that page.

21   And Page 6, with the date being 6-18-99, so again,

22 it's speculation on my part, but I would doubt that anything has

23 been left off of this document, just my knowledge of how our

24 e-mail system works.

25  Q. All right.  Do you recall whether or not a

MC GINNIS & ASSOCIATES, INC.
614.431.1344     COLUMBUS, OHIO     800.498.2451
www.mcginniscourtreporters.com

1    Pennsylvania/New York action plan was ever formally adopted?

2    And by "formally", I mean put into writing.

3              MS. FREEMAN:  Objection as to form.

4              Go ahead, please.

5              THE WITNESS:  No, I do not know.

6    BY MR. HENNESSEY:

7         Q.    Okay.  Let me show you this document, if I could,

8    please.

9              MS. FREEMAN:  Thank you, Mr. Hennessey.

10             MR. HENNESSEY:  You're welcome.

11                                - - -

12             Thereupon, Defendants' Exhibit No. 26 was

13             marked for purposes of identification.

14                                - - -

15             (Pause.)

16   BY MR. HENNESSEY:

17        Q.    All right.  The document -- Addressing the first page

18   of the document, which I believe is, excuse me, 26.  Can you

19   tell me, first of all, if by looking at the various CCs on the

20   document whether it was a document that you would have received?

21        A.    Yes, I'm noted as a copy recipient of the -- Yes, I

22   am.  I am noted as a copy recipient.

23        Q.    Now, this -- this appears to be -- The subject matter

24   was "New York Agency Defection Update".

25             Do you know whether or not you received updates with

MC GINNIS & ASSOCIATES, INC.
614.431.1344    COLUMBUS, OHIO    800.498.2451
www.mcginniscourtreporters.com

143

1        A.    Yes.

2        Q.    And once you had made your presentation, did you

3    maintain any files which contained those written documents that

4    you worked from in making that presentation?

5        A.    No.

6        Q.    Okay.  Do you know whether or not Miss Greenstein did?

7        A.    No, I do not.

8        Q.    Okay.  Do you know whether or not anybody in the

9    company kept them?

10       A.    It would be normal practice -- So you understand with

11   the presentations, our normal style for our Board reports are

12   what are called power point presentations, and depending upon

13   what's going on in the organization, there might be as many as

14   10 or 15 items that are reviewed with the Board at a particular

15   meeting.

16            Going back to some of the earlier exhibits, it appears

17   in the August, September, October time frame a report was

18   prepared for the -- for the Board.  It is likely -- I do not

19   recall, but it is likely that one of the 10 or 15 items that was

20   reported to the Board that particular month was on this subject.

21            Those documents, as far as I know, are retained by the

22   Office of Corporate Secretary, and my guess is somewhere in the

23   archives of this institution you will find that Board

24   presentation.

25       Q.    Okay.  The next document -- Excuse me a minute.

1          (Pause.)

2          The next document I'd like to show you is this

3    document, sir.  Thank you.

4          MS. FREEMAN:  Thank you, Mr. Hennessey.

5          MR. HENNESSEY:  You're welcome.

6                              -  -  -

7          Thereupon, Defendants' Exhibit No. 27 was

8          marked for purposes of identification.

9                              -  -  -

10          (Pause.)

11    BY MR. HENNESSEY:

12      Q.    With respect to the exhibit which was --

13          MR. HENNESSEY:  What number, please?

14          MR. COULOM:  27.

15    BY MR. HENNESSEY:

16      Q.    With respect to the exhibit which we've marked as

17    27 --

18          MS. FREEMAN:  I'm sorry, I thought it was 25.

19          MR. HENNESSEY:  Which maybe we --

20          THE WITNESS:  It's 27.

21          MR. HENNESSEY:  -- could go off the -- Yeah.

22          MS. FREEMAN:  I'm sorry.

23          THE WITNESS:  The witness is aware that it is

24    Exhibit 27.

25          MS. FREEMAN:  I'm sorry, I'm going backwards instead

145

MC GINNIS & ASSOCIATES, INC.
614.431.1344    COLUMBUS, OHIO    800.498.2451
www.mcginniscourtreporters.com

1      of forwards.  I apologize.

2      BY MR. HENNESSEY:

3          Q.  All right.  Okay.  In any event, in Exhibit 27, I -- I

4      want to ask you, first of all, do you ever recall seeing this

5      document at or about January 21 of the year 2000?

6          A.  No, I do not.

7          Q.  It says -- On the first page of the document, it makes

8      a reference about the necessity to prepare an actual to plan

9      comparison of defection agent -- defection agent revenue loss in

10     2000.  This report will go to Galen Barnes.

11              Did you receive such a report?

12         A.  Yes.  Each month -- Each month I have a financial

13     review meeting with essentially the financial people in the

14     company.  My leadership team generally comes to that meeting.

15     We review the expenses, the losses, the premium retention and

16     many financial statistics.

17              As a result of the concern of the organization during

18     this period of time in 1999 and 2000, we had a monthly report as

19     to our retention and whether we'd had additional agents leave us

20     and things of that nature.

21         Q.  Now, on the first page, the -- one of the gentleman --

22     the second name on it is -- is Ray Blackburn, and -- and below

23     that it says, "New York".

24              What was -- relationship did Mr. -- did Mr. Blackburn

25     have to New York agents?

MC GINNIS & ASSOCIATES, INC.
614.431.1344    COLUMBUS, OHIO    800.498.2451
www.mcginniscourtreporters.com

1                    A F F I D A V I T

2                         - - -

3    STATE OF _____, )
                               ) SS:
4    COUNTY OF _____, )

5            Galen Barnes, having been duly placed under oath,

6    deposes and says that:

7            I have read the transcript of my deposition taken on

8    Thursday, October 11, 2001, and made all necessary changes

9    and/or corrections as noted on the attached correction sheet, if

10   any.

11

12

13                         _____
                           Galen Barnes
14           Placed under oath before me and subscribed in my

15   presence this _____ day of _____, _____.

16

17

18                         _____
                           Notary Public
19   My Commission Expires:    _____.

20                              - - -

21

22

23

24

25