# Exhibit 2

NORRIS JOSEPH YOUNG, JR. - May 25, 2000

--- PAGE 1 SHEET 1 ---

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

* * * * * * * * * * * * * * * *

NATIONWIDE MUTUAL INSURANCE
COMPANY, ET AL.,
    PLAINTIFFS,      3:00CV0619 (CFD)

vs.

JOHNSON AGENCY, INCORPORATED
and BONNIE JOHNSON,
    DEFENDANTS.

* * * * * * * * * * * * * * * *

DEPOSITION OF: NORRIS JOSEPH YOUNG, JR.

Taken before Sarah B. Najemy, Licensed Shorthand Reporter (#00069) and Notary Public in and for the State of Connecticut, pursuant to the Federal Rules of Civil Procedure, at the law offices of Robinson & Cole, LLP, 280 Trumbull Street, Hartford, Connecticut, on May 25, 2000 at 10:10 a.m.

SMITH REPORTERS INCORPORATED
Post Office Box 154
Bristol, CT 06011
Tel: (860) 585-0764
FAX: (860) 585-6341

--- PAGE 2 ---

                        APPEARANCES

BINGHAM DANA, LLP
Deborah S. Freeman, Esquire
One State Street
Hartford, CT 06103-3178

            Representing the Plaintiffs

ROBINSON & COLE, LLP
Frank F. Coulon, Esquire
Edward F. Hennessey, Esquire
280 Trumbull Street
Hartford, CT 01603-3597

            Representing the Defendants

--- PAGE 3 ---

                        STIPULATIONS

    IT IS STIPULATED by the attorneys for the Plaintiff and the Defendant that each party reserves the right to make specific objections in open Court to each and every question asked and the answers given thereto by the witness, reserving the right to move to strike out where applicable, except as to such objections as are directed to the form of the question.

    IT IS STIPULATED and agreed between counsel for the parties that the proof of the authority of the Notary Public before whom this deposition is taken is waived.

    IT IS FURTHER STIPULATED and agreed that the reading and signing of this deposition are not waived and any defects in the notice are waived.

--- PAGE 4 ---

        NORRIS JOSEPH YOUNG, JR.,
    having first been duly sworn, was examined
    and testified as follows:
        MR. COULON: Would you like the
    witness to read and sign?
        MS. FREEMAN: Yes, please. And the
    only thing everyone should be advised of is
    that Mr. Coulon and I have entered into a
    provisional protective order whereby we
    have agreed, pending the court's ruling,
    that any documents that are produced will
    be maintained as confidential until the
    court rules. And then we will, of course,
    abide by the court's ruling.
                * * * * *
        DIRECT EXAMINATION BY MR. COULON
Q   Would you state your full name, please?
A   Norris Joseph Young, Jr.
Q   And by whom are you employed?
A   Nationwide Insurance.
Q   Is there any particular entity of Nationwide
    that is responsible for your compensation? Do
    you know what your check says, your W4 or W2?
A   I believe it says Nationwide Insurance.
Q   What is your date of birth?

PAGE 5 SHEET 2

5

1  A   8/8/62.
2  Q   What is your current title with Nationwide
3      Insurance?
4  A   My official title is New England sales officer.
5  Q   Have you been deposed before?
6  A   No, sir.
7  Q   In any case?
8  A   Never.
9  Q   Okay. Has Attorney Freeman -- don't tell me
10     what you have discussed -- but has she gone over
11     with you any of the procedures for a deposition
12     generally?
13 A   She explained to me how depositions normally
14     would go.
15 Q   Okay. We are going to be interrupted in a few
16     minutes for a fire drill. And I apologize to
17     everyone for that. I have no control over that.
18     The City of Hartford is mandating that we leave.
19     It will be brief. And then we will come back.
20     If at any time, when we do get going in earnest,
21     if you need a break please let me know.
22 A   No problem.
23 Q   If you can't hear my question, or you don't
24     understand my question, please ask me to
25     rephrase it, and we will try to do so. Only one

PAGE 6

6

1      of us can talk at a time. So please try not to
2      answer while I'm talking. And I will try to
3      respect your answers. Finally, you must answer
4      audibly. You tend to shake your head, I
5      noticed, and the shake of the head can't be
6      recorded. So, with that, do you have any
7      questions about procedure before we begin?
8  A   No, I don't.
9  Q   Okay. Now you said you are the New England
10     sales officer. What territory do you cover,
11     what states?
12 A   The states of Connecticut, Rhode Island, New
13     Hampshire, Vermont and Maine.
14 Q   And how many agents does Nationwide have in
15     Rhode Island?
16 A   Approximately forty-two.
17 Q   And how many agents does Nationwide have in New
18     Hampshire?
19 A   Approximately nineteen.
20 Q   And in Maine?
21 A   Five.
22 Q   And in Vermont?
23 A   Approximately twenty-four.
24 Q   And how many agents does Nationwide currently
25     have in Connecticut?

PAGE 7

7

1  A   Approximately 190.
2  Q   Does that include employees and independent
3      contractors?
4      MS. FREEMAN: Objection as to form.
5      Do you mean employee agents?
6  BY MR. COULOM:
7  Q   Yes.
8  A   It includes what we consider independent
9      contractor agents and any form of a financed
10     agents.
11 Q   And a financed agent is employed by Nationwide?
12 A   We have different forms of financing. Some
13     people are employed by Nationwide. Some people
14     are what is called a passport agent. And they
15     are an independent contractor, per se. But they
16     have stipulations per an addendum that they must
17     adhere to in order to continue to receive
18     financing. So, it's a mixture.
19 Q   How many independent contractor agents without
20     passport agreements are there currently in
21     Connecticut?
22 A   I do not know.
23 Q   Where is your office located?
24 A   My office is located at 30 Waterside Drive,
25     Farmington, Connecticut.

PAGE 8

8

1  Q   And where do you reside?
2  A   I live in Burlington, Connecticut.
3  Q   What are your duties as New England sales
4      officer?
5  A   My duties include, but are not limited to,
6      anything relating to the sale and distribution
7      of Nationwide's insurance products.
8  Q   And when you say Nationwide's insurance
9      products, how many insurance products are there
10     that Nationwide has approximately?
11 A   I couldn't begin to tell you.
12 Q   How many lines of insurance are you responsible
13     for?
14 A   At this point in time I'm responsible for the
15     property and casualty.
16 Q   Who has responsibility for commercial?
17 A   That would fall under me.
18 Q   That's under you also?
19 A   That is correct.
20 Q   How about health insurance?
21 A   I don't believe that we are selling health
22     insurance at this time. But if it did, it would
23     be handled out of Columbus, Ohio.
24 Q   Any medical insurance, medical benefits
25     insurance, that Nationwide sells?

PAGE 81  SHEET 21

81

1  Again, continue to hold other meetings and
2  just let people know we care and point out the
3  challenges that have occurred over time, and
4  they understand that this is not exclusive to
5  Nationwide Insurance. But let them be based
6  with fact.
7  Q   Have you done anything else?
8  A   Not that I can recall specifically.
9  Q   This executive outreach, you said you talked to
10     Dave. I assume you mean Dave Donaldson?
11 A   That is correct.
12 Q   When did you reach out to Dave Donaldson?
13 A   I have had an open line of communication with
14     Dave since I arrived. The meetings that Dave
15     would attend if he had questions, I would call
16     him. I would field his questions. And whether
17     he agreed with my opinion or my answer or not, I
18     never neglected him, never shied away from him.
19     Any time that Dave would call me, I would call
20     him back. When I heard the rumors, the word on
21     the street, that Dave was leaving, I recall
22     calling and saying, "You don't need to be
23     leaving. Let's stay the course. Things will
24     get better." I mean, nothing very high tech.
25     Nothing much more than that. Just made a

PAGE 82

82

1  conscious effort to try to point out the things
2  that are going good.
3  Q   Have you ever gone to visit an agent's office
4      when you heard a rumor that they were going to
5      leave to discuss whether that agent should or
6      shouldn't leave?
7  A   I recall visiting one in person.
8  Q   Who is that?
9  A   A gentleman by the name of Ron Dunn, D-U-N-N.
10 Q   Did he leave?
11 A   No, sir.
12 Q   When did you hear a rumor that he was going to
13     leave?
14         MS. FREEMAN: Objection as to form.
15         THE WITNESS: I don't remember
16     exactly when. It's been some time.
17 BY MR. COULOM:
18 Q   And when did you go visit Mr. Dunn to discuss
19     the rumor that he was going to leave?
20 A   I don't remember the exact date.
21 Q   Was it within the last month?
22 A   No. It's probably been within -- I would guess
23     it was probably three months ago maybe.
24 Q   So, was it in the year 2000?
25 A   Yes.

PAGE 83

83

1  Q   During the year 1999 how many former agents did
2      you visit who were then Nationwide agents at the
3      time?
4          MS. FREEMAN: Objection as to form.
5  BY MR. COULOM:
6  Q   I will rephrase the question. Nationwide has
7      lost about fifteen to twenty agents in the last
8      eighteen months; correct?
9          MS. FREEMAN: Objection as to form.
10     In Connecticut?
11 BY MR. COULOM:
12 Q   In Connecticut.
13 A   I don't know the exact numbers. It's probably
14     fifteen, eighteen maybe over probably a year and
15     a half maybe.
16 Q   And how many of those fifteen to eighteen people
17     that you are thinking of, regardless of the
18     number, did you go visit with in 1999?
19 A   Ron Morin, Jim Warner. I met with John
20     Marcucilli.
21 Q   The offices. Where you went to their offices.
22     I want to know meetings you had in their
23     offices.
24 A   Morin, Warner -- without seeing the list of the
25     others, I can't say for a fact.

PAGE 84

84

1  Q   Have you ever been to Pat Bland's office?
2  A   No, I have not.
3  Q   Were you ever at Bruce Mortenson's office?
4  A   No, sir.
5  Q   Were you ever at David Donaldson's office?
6  A   No, sir.
7  Q   Were you ever at Bonnie Johnson's office?
8  A   I believe I was at Bonnie's.
9  Q   And for what purpose?
10 A   No purpose.
11 Q   Pardon me?
12 A   For no purpose.
13 Q   Were you there to discuss whether or not she
14     should stay or leave Nationwide?
15 A   I don't recall us saying any of that stuff.
16 Q   Were you ever at John Marcucilli's office?
17 A   Not in his office.
18 Q   Were you ever at Jim Biorelli's office?
19 A   Not in his office.
20 Q   Were you ever at the office of an agent named
21     Cuocco, C-U-O-C-C-O?
22 A   I don't believe he was here when I was here. I
23     don't recall him being an agent since I've been
24     in Connecticut.
25 Q   How about an agent named Javons, Scott Javons?

PAGE 85 SHEET 22

85

```
 1  A    No, I did not.
 2  Q    You never went to Mr. Javons' office?
 3  A    Not that I can recall.
 4  Q    Have you ever been to the office of a former
 5       agent named Tim Berg?
 6  A    No.
 7  Q    How about the office of Greg Royko, did you ever
 8       visit Mr. Royko's office?
 9  A    No.
10  Q    Did you ever visit Mr. York's office?
11  A    No.
12  Q    Did you ever visit Mr. McMann's office?
13  A    Yes.
14  Q    For what purpose?
15  A    I believe I was at Ed's on two different
16       occasions. Both of which were I believe just to
17       stop and say hello. I was passing by.
18  Q    Did you ever visit Mr. Lodi's office?
19  A    I've never been to Frank's.
20  Q    Have you ever been to Mr. Makarowski's office?
21  A    Yes, I have.
22  Q    On how many occasions?
23  A    I believe it was one.
24  Q    And when was that?
25  A    I don't recall. It was in '99 sometime, I
```

PAGE 86

86

```
 1       believe.
 2  Q    Were you there to discuss whether he should or
 3       shouldn't leave the company?
 4  A    No.
 5  Q    When you were in Mr. Morin's office did you
 6       discuss whether he should or shouldn't leave the
 7       company?
 8  A    We discussed what was on Ron's mind. Ron
 9       indicated he was considering leaving, and we
10       talked about it.
11  Q    During that time did you indicate to him that
12       Nationwide would sue him if he left?
13  A    Not at all.
14  Q    Why not?
15            MS. FREEMAN: Objection as to form.
16            THE WITNESS: We don't sue people just
17       because they leave.
18  BY MR. COULOM:
19  Q    Why do you sue people?
20            MS. FREEMAN: Objection as to form.
21       Why does he?
22  BY MR. COULOM:
23  Q    Withdrawn. Why does Nationwide sue people?
24  A    It's my opinion that Nationwide brings
25       litigation against people who do not follow
```

PAGE 87

87

```
 1       their policies and procedures, the ones that
 2       they agree to.
 3  Q    Is that the only reason?
 4  A    It's the only reason that I'm aware of.
 5  Q    Is Nationwide selective about who they choose to
 6       sue and who they choose not to sue?
 7  A    Not to my knowledge.
 8  Q    So, you are saying, if someone engages in
 9       conduct that violates the policies and
10       procedures that they have agreed to, you would
11       sue all of those people?
12            MS. FREEMAN: Objection as to form.
13            THE WITNESS: Are you telling me that
14       or are you asking?
15  BY MR. COULOM:
16  Q    I'm asking you. Is that their policy to sue
17       everyone who violates policies and procedures
18       that they have agreed to?
19  A    I believe that our policy, our position is that
20       the people who do not follow the policies and
21       procedures, do not give us the information that
22       they agreed was ours at the time of their
23       contract signing, then based on the limited
24       resources that we have, we will pursue
25       litigation with those individuals.
```

PAGE 88

88

```
 1  Q    What do you mean based on the limited resources
 2       that you have?
 3  A    I mean I can't do an effective job -- as I'm
 4       sure you would attest, that you can't bring
 5       action against everybody all at the same time
 6       and do it justice. You concentrate your
 7       energies and then you move on.
 8  Q    Tell me how you concentrate your energies?
 9  A    I think it's evident how we are concentrating
10       our energy. We now have people who appear to be
11       working in conjunction with one another. We
12       have people that based on where they are located
13       and how big their volume size is, how much
14       they're going to be able to potentially hurt the
15       asset that we're responsible for protecting,
16       then it just makes good business sense to go
17       after those individuals -- or prioritize, I
18       should say, to go after that group of
19       individuals and work accordingly.
20  Q    Who have you talked to in conjunction with these
21       priorities?
22            MS. FREEMAN: Objection as to form.
23       To the extent that it's attorneys, I don't
24       want you to report conversations with
25       attorneys.
```