NORRIS JOSEPH YOUNG, JR. - May 25, 2000

PAGE 89 SHEET 23

**89**

1   THE WITNESS: It's with my attorneys.
2   BY MR. COULOM:
3 Q So all of these discussions about setting
4   priorities have been with lawyers?
5 A All that I can recall.
6 Q And are those lawyers inside the company?
7 A It would be both inside and out.
8 Q Who is responsible for making the decision to
9   sue a former agent in Connecticut?
10 A I would say, most likely ultimately responsible
11   would be me for making that decision. I would
12   work with my attorneys, both inside and out.
13   That's how it would go.
14 Q Have you ever discussed any of these subjects
15   with anyone who is not an attorney?
16 A I have discussed the plan of action, if that's
17   what you would call it, with Jim Shortley the
18   state officer.
19 Q Can you tell me what you and Mr. Shortley have
20   discussed about the plan of action?
21       MS. FREEMAN: Objection as to form.
22       He said it's the plan of action, if that's
23       what you would call it.
24 BY MR. COULOM:
25 Q Your objection is noted.

PAGE 90

**90**

1 A The discussions with Jim regarding how we choose
2   to proceed have been primarily just as a
3   courtesy, because he is the state officer, as I
4   mentioned our relationship earlier in the
5   deposition.
6 Q Well, what did you tell him as a courtesy?
7 A I don't recall every conversation that has
8   occurred. I mean, basically, here's what we're
9   doing with Bland Mortenson and Donaldson.
10   Here's what we think we should do.
11 Q Well, what did you tell him you were doing with
12   Bland, Mortenson and Donaldson and why?
13 A I told him that we are bringing legal actions
14   against Bland, Mortenson and Donaldson because
15   they have not complied with all of the
16   provisions of their agency agreement.
17 Q That's all you told him?
18 A That's all I can recall.
19 Q Did he say, 'why haven't we done this before?'
20 A I don't recall him saying.
21 Q Tell me what your role is with respect to
22   litigation with Mr. Makarowski?
23 A What was my role?
24 Q Yes.
25 A The same role that I just outlined for you. The

PAGE 91

**91**

1   process I just told you.
2 Q What is your understanding of what
3   Mr. Makarowski did wrong?
4 A In my opinion Mr. Makarowski did not give us --
5   again, if I'm remembering correctly -- he did
6   not give us the policyholder files. He violated
7   the no compete provision, or that provision in
8   the contract that says how far and what length
9   of time, and the fact that he directly solicited
10   Nationwide clients. I believe all three of
11   those things are spelled out very clearly in the
12   agent's agreement that he signed.
13 Q Before Mr. Makarowski what agent litigation were
14   you involved in?
15 A I have been not been involved in any before
16   that.
17 Q And when did the agent litigation with
18   Mr. Makarowski begin?
19 A I don't remember the exact dates. It began once
20   he left and started competing against us.
21 Q So, between 1988 and, at least, 1998, when you
22   came -- withdrawn. You came to Connecticut
23   when?
24 A I believe it was July 1998.
25 Q Okay. So between 1988, when you started with

PAGE 92

**92**

1   Nationwide, and July of 1998 you were unaware of
2   any agent litigation involving Nationwide and
3   its agents?
4       MS. FREEMAN: Frank, I think your
5       question was -- I thought you said between
6       the time you started and July 1998.
7 BY MR. COULOM:
8 Q I said between the time you started in 1998 and
9   July '98 --
10 A You said '88. But that's okay.
11       MS. FREEMAN: I'm confused.
12       MR. COULOM: Could I please ask the
13       questions. If I get them wrong, just leave
14       them alone, okay?
15       MS. FREEMAN: But you used the same
16       date twice. I don't understand how he can
17       answer that. All I was trying to do was
18       understand what you wanted.
19       MR. COULOM: That's fine.
20 BY MR. COULOM:
21 Q Do you understand what I'm asking you, sir?
22 A No, I don't.
23 Q What do you think I'm asking you?
24 A I don't even know what you're asking me.
25 Q You have no idea?

SMITH REPORTERS INCORPORATED

PAGE 125  SHEET 32

125

1       before he got here.
2           THE WITNESS: No, not at all.
3   BY MR. COULOM:
4   Q   Now, would you tell me what threats you have
5       made to put former agents out of business?
6           MS. FREEMAN: Objection as to form.
7           THE WITNESS: None.
8   BY MR. COULOM:
9   Q   You have made none. Have you ever said anything
10      in words or substance that might be construed by
11      others to imply that you are going to drive
12      former agents out of business?
13  A   Not to my knowledge.
14  Q   You have never said anything like that?
15  A   Not to my knowledge.
16  Q   Have you ever said in words or substance that
17      you will cut people off at the knees?
18  A   I don't recall saying that exactly. From time
19      to time people speak in sports metaphors. I
20      don't believe that there was any intent behind
21      it if I did say anything.
22  Q   Well can you give me some of the sports
23      metaphors that you might have used with respect
24      to the actions you would take against former
25      agents?

PAGE 126

126

1           MS. FREEMAN: Objection as to form.
2           Go ahead.
3           THE WITNESS: Seeing how there is
4       nothing that I would say on a repeated
5       basis, I have no idea.
6   BY MR. COULOM:
7   Q   Have you discussed with Mr. Miles the deposition
8       testimony he gave in this case?
9   A   I have not.
10  Q   You didn't know that Mr. Miles also spoke about
11      sports metaphors?
12  A   I have no idea what Steve spoke about.
13  Q   So you don't recall ever saying that you would
14      cut Mr. Donaldson off at the knees?
15  A   For the record, one more time, I do not recall
16      saying that.
17  Q   Is that a sports metaphor?
18  A   I guess that's subject to interpretation.
19  Q   Well, what do you mean by sports metaphor?
20      What's a sports metaphor that you were thinking
21      of?
22  A   None comes to mind off the top of my head.
23  Q   I see. Do you ever recall telling Ms. Johnson
24      that you would do whatever it takes to stop
25      David Donaldson?

PAGE 127

127

1   A   No. I do recall saying, as a regular practice,
2       that Nationwide will pursue all legal remedies
3       available to them. I don't remember directly
4       about any one individual.
5   Q   Do you recall ever saying to anyone, including
6       Bonnie Johnson, that Nationwide will spend
7       whatever it takes to stop former agents?
8   A   I don't recall ever saying that.
9   Q   Or anything like that?
10  A   I believe anything remotely close to that would
11      be that Nationwide has to do what it takes to
12      protect the policyholder's interest, and the
13      agents' interest that choose to stay.
14  Q   Have you said anything like that?
15  A   Sure.
16  Q   Can you tell me when you last made statements to
17      the effect that Nationwide will do whatever it
18      takes to protect whatever it's going to protect?
19  A   I don't remember exactly when I said that.
20  Q   You don't remember. Do you know if you said it
21      more than once?
22  A   I'm sure I have.
23  Q   And when you have said that, were you trying to
24      encourage existing agents that they should stay
25      with Nationwide?

PAGE 128

128

1           MS. FREEMAN: Objection as to form.
2           Go ahead.
3           THE WITNESS: Not at all. I said
4       earlier, if you recall, I want people to
5       make educated decisions on what they choose
6       to do.
7   BY MR. COULOM:
8   Q   And as part of those educated decisions have you
9       ever threatened agents with lawsuits?
10  A   I've never threatened anyone.
11  Q   I see. Do you have a temper?
12          MS. FREEMAN: Objection as to form.
13          THE WITNESS: What is the definition
14      of temper?
15  BY MR. COULOM:
16  Q   Have you ever screamed at an agent?
17  A   I don't recall a time I've ever screamed at an
18      agent.
19  Q   Have you ever screamed at Jim Warner?
20  A   No. I can guaranty I have never screamed at Jim
21      Warner.
22  Q   Have you ever screamed at Bonnie Johnson?
23  A   Not to my knowledge.
24  Q   You were talking about caring about agents. Do
25      you recall getting a letter from Bonnie Johnson?

NORRIS JOSEPH YOUNG, JR. - May 25, 2000

PAGE 145 SHEET 37

145

1  Homer Tindall.
2  Q  How do you spell his name?
3  A  T-I-N-D-A-L-L. A Texas agent. Ron White, Texas
4     agent. Dennis Pfalzgraff.
5  Q  Where is he from?
6  A  Texas. David Nix, Texas.
7  Q  N-I-X?
8  A  N-I-X. I believe Leslie Liere, L-I-E-R-E,
9     Texas. That's all I can remember specifically.
10 Q  You mentioned that there were two resignations
11    while, or just after, you were sales manager in
12    Texas. Did you ever explain the agency
13    agreement, or employment agency agreement, with
14    either of those persons?
15 A  I definitely did with their financed agent
16    agreement. And because they did not transition
17    to the independent contractor agreement I did
18    not discuss that with them at that time.
19 Q  And what were those names again, please?
20 A  The first name was Susan Hamilton. The other
21    individual was Gary Rumsey.
22 Q  And Rumsey is now in California, at least the
23    last you knew?
24 A  I believe he went to California.
25 Q  And what happened to Susan Hamilton?

PAGE 146

146

1  A  I believe she's still in Texas. I can't
2     guarantee that. She married and decided that
3     she did not need to continue employment.
4  Q  So you don't think she stayed in the insurance
5     industry, at least you have no knowledge of
6     that?
7  A  She did not immediately after she left us, and
8     during the time that I was still in Texas, that
9     I'm aware of.
10 Q  Whose duties did you assume when you came to
11    Connecticut?
12 A  I have a newly created position.
13 Q  But whose duties did you take over, which person
14    or persons?
15        MS. FREEMAN: Objection as to form.
16        Go ahead.
17        THE WITNESS: It was like a
18    combination. I freed up some duties from
19    Jim Shortley, the gentleman that I
20    indicated was the state officer, and some
21    duties that I believe were being conducted
22    in the home office.
23 BY MR. COULOM:
24 Q  And who do you believe at the home office was
25    conducting those duties before you?

PAGE 147

147

1  A  I don't remember. I don't know these people.
2     And that's just an assumption on my part.
3  Q  Do you know Henry Bradley or Butch Bradley?
4  A  Yes, I do.
5  Q  Have you ever discussed with Mr. Bradley the new
6     independent contractor agent's agreement?
7  A  I have not. Butch came to a meeting of the
8     sales officers and shared with us a draft copy
9     of a proposed agreement.
10 Q  When did that take place?
11 A  Sometime this year. Maybe three to four months
12    ago. It was this year.
13 Q  And who was at that meeting besides yourself and
14    Mr. Bradley?
15 A  The other people throughout the company that had
16    my position; other sales officers.
17 Q  And where did the meeting take place?
18 A  I don't remember the exact location. We have
19    meetings at different places, so I don't
20    remember where we were that time.
21 Q  Did you receive an agenda for this meeting?
22 A  We typically receive an agenda ahead of time.
23    And I can't recall if that was an agenda item.
24 Q  Do you save the agendas?
25 A  I think I have most of them.

PAGE 148

148

1  Q  And do you get these agendas by e-mail?
2  A  Yes.
3  Q  Who else was present besides Mr. Bradley in the
4     sales office; anybody else from home office?
5  A  Tom Starr would have been in that meeting, my
6     boss. The person that helps him. A gentleman
7     by the name of Addison Smith. I don't recall
8     anybody else. We constantly have different
9     people for different topics.
10 Q  Tell me what your reaction was when the new
11    draft agreement was proposed or discussed.
12        MS. FREEMAN: Objection as to form.
13        Go ahead.
14        THE WITNESS: I really had very little
15    reaction. It's virtually the same.
16 BY MR. COULOM:
17 Q  Virtually the same as what?
18 A  As the current.
19 Q  What do you think is different about the draft
20    that you saw?
21        MS. FREEMAN: Objection as to form.
22        Go ahead.
23        THE WITNESS: The two areas that
24    seemed to make an impression on me were:
25    One, concerning advertising, so that when

PAGE 149  SHEET 38

149

```
 1      an independent contractor advertises,
 2      Nationwide is just asking then to make sure
 3      they have the Nationwide logo in their
 4      advertising. The second area would just be
 5      a clarification of X dates. Meaning, from
 6      what I interpreted, to mean clarifying the
 7      expiration dates of the policies that are
 8      in force.
 9  BY MR. COULOM:
10  Q   What is an X date?
11  A   An X date is terminology for an expiration date,
12      or a renewal date of an insurance contract.
13  Q   How do you clarify the X dates or the renewal
14      dates of a policy? Isn't a date a date? I
15      mean, January 1 is January 1. What do you mean
16      by clarifying the expiration dates of the
17      policies?
18          MS. FREEMAN: Which question would you
19      like him to answer out of those three or
20      four questions you just posed rapidly to
21      him one after the other.
22          MR. COULOM: He can choose whichever
23      he likes.
24          MS. FREEMAN: No. I think you should
25      ask him one question at a time, and let him
```

PAGE 150

150

```
 1      answer.
 2          MR. COULOM: Are you instructing him
 3      not to answer?
 4          MS. FREEMAN: Frank, which question
 5      would you like him to answer?
 6  BY MR. COULOM:
 7  Q   How do you clarify an expiration date?
 8  A   It's my opinion that when we use expiration
 9      dates, more often than not they're referring to
10      the active prospecting component of our
11      business. And it's X dates of people that they
12      are trying to write. I believe this new
13      agreement clarified, when they are talking about
14      X dates, they're talking about the expiration
15      dates of policyholders that we insure.
16  Q   I'm not sure I understand. Let me try again.
17      The existing agreement, does it say anything
18      about expiration dates?
19  A   I believe that it does, to my recollection.
20  Q   What do you believe it says?
21  A   I believe it talks about the policies, the file,
22      you know, all of the materials that they use
23      throughout the course of representing
24      Nationwide. The clarification that I am
25      referring to was letting them know that we're
```

PAGE 151

151

```
 1      not talking about X dates of future business.
 2      They're talking about don't take the expiration
 3      dates from the in force policies and take that
 4      stuff with you, because that's company
 5      information. That's what I believe they were
 6      attempting to clarify.
 7  Q   So the expiration dates of in force policies you
 8      believe is company information?
 9  A   That's my interpretation.
10  Q   What about information about prospects, is that
11      company information?
12  A   Not in my opinion.
13  Q   Why not?
14  A   Because it's not a policy yet. It's not
15      information that this company has done something
16      with in order to secure insurance. It's no
17      different than a lead that they would purchase
18      from some lead firm.
19  Q   So, if an agent were to leave and take its
20      prospects list with them and solicit those
21      people and refuse to give back prospect lists to
22      Nationwide, would that lead you to sue them, if
23      that's all they did?
24  A   It's my opinion that the X dates -- the names of
25      potential future things, it's my opinion that
```

PAGE 152

152

```
 1      that's not a violation. If we ran across a
 2      scenario like that, I would run it by our
 3      general counsel, and they would help clarify the
 4      company position.
 5  Q   But you, being the decisionmaker, based on what
 6      you know, would not recommend that that person
 7      be sued?
 8  A   With the knowledge that I have today, I would
 9      not recommend that. But the general counsel are
10      the people who know the legal aspects of what is
11      and what isn't. And they will make a
12      recommendation to me. And then I would make a
13      decision.
14  Q   How do you have an expiration date for a
15      prospect, because there is no policy that
16      expires?
17          MS. FREEMAN: Objection as to form.
18      There is an existing policy.
19  BY MR. COULOM:
20  Q   An existing policy with whom?
21  A   Wherever.
22  Q   For some other company, you mean?
23  A   Obviously.
24  Q   Okay. So, how does the new agreement clarify
25      whether or not prospect lists belong to the
```