PAGE 153    SHEET 39

153

1   agent or belong to the company?
2            MS. FREEMAN: Objection as to form.
3        Go ahead.
4            THE WITNESS: I'm not sure how it
5        clarifies. Me reading it, what I
6        understand is that it made a definitive
7        statement as to what they're meaning by X
8        dates. And they meant X dates of the
9        existing policies that are in force.
10  BY MR. COULOM:
11  Q   So you think the new agreement doesn't apply to
12      prospect lists?
13  A   That's my opinion.
14  Q   I see.
15  A   Of future prospects.
16  Q   Okay. What else was discussed at this meeting
17      about the new policy, the new draft independent
18      contractor agreement?
19  A   Very little. It was, 'here's what they're
20      proposing. They don't know when they're going
21      to implement it, if they're going to implement
22      it.' But the thought at that time was they
23      would probably be moving forward with this at
24      some point in time. They wanted to let us know
25      that they were having those discussions -- who

PAGE 154

154

1   the "they" is, I don't know -- having those
2   discussions to make that decision as to whether
3   or not they would move forward with having one.
4   That was basically it.
5   Q   Did they pass out a draft of a proposed
6       contract?
7   A   I believe they did.
8   Q   Did they make everyone give it back at the end
9       of the meeting?
10  A   I don't think so. I don't recall them asking
11      for it back.
12  Q   So you kept a copy?
13  A   I don't remember if I have a copy. I don't
14      recall giving one back.
15  Q   Do you normally keep the materials that are
16      handed out at these sales officer meetings?
17  A   I keep the material that would be relevant to me
18      at that point in time.
19  Q   Did any part of the new agreement strike you as
20      being heavy-handed?
21           MS. FREEMAN: Objection as to form.
22       Go ahead.
23           THE WITNESS: In my opinion nothing
24       jumped out as being heavy-handed.
25  BY MR. COULOM:

PAGE 155

155

1   Q   Do you recall anything in the new agreement
2       about confidentiality of information?
3   A   I believe there was something about that, yes.
4   Q   What discussions took place, if any, about that
5       clause at this meeting?
6            MS. FREEMAN: Objection as to form.
7        Go ahead.
8            THE WITNESS: Again, I don't remember
9        the exact discussions, but nothing very
10       elaborate. If I remember correctly the
11       whole topic probably wasn't fifteen, twenty
12       minutes.
13  BY MR. COULOM:
14  Q   Who led the discussion?
15  A   Henry Bradley.
16  Q   Did he have slides for this?
17  A   No, I don't believe so.
18  Q   So you don't recall if there was a powerpoint
19      presentation?
20  A   I don't believe that there was. I don't
21      remember seeing any. I think it was simply --
22      what I remember was that the draft document -- I
23      don't remember any. There were no overheads, no
24      powerpoint that I can remember.
25  Q   Did anybody talk about how this agreement would

PAGE 156

156

1   impact any of the agent litigation that was
2   going on?
3   A   That was not discussed.
4   Q   How many conversations have you had with Joseph
5       Pizzi about defecting agents?
6   A   Probably about two.
7   Q   How many conversations have you had with Cindy
8       Tolzna about agent defections?
9   A   Never had any conversations with Cindy,
10      necessarily, directly on this. We have a
11      teleconference that we hold -- or attempt to
12      hold once a month. And we talk about
13      challenges, or how the service center is doing.
14      Just general overview. Nothing specific about
15      any agent.
16  Q   Who is responsible for coordinating that
17      teleconference?
18  A   No one is designated as necessarily being
19      responsible. Cindy and her assistant, I'm
20      assuming, have just been the people that say,
21      'I'll set up the next one,' so that one person
22      sets it up versus a bunch of people.
23  Q   So, that teleconference involved Cindy Tolzna.
24      Anybody in New York?
25  A   It's a standing meeting. Meaning they will hold

NORRIS JOSEPH YOUNG, JR. - May 25, 2000

PAGE 157   SHEET 40

157

1 and players come in and out. There have been
2 players from New York.
3 Q Who are the players that participate from time
4 to time?
5 A There has been a gentleman by the name of Dave
6 Devey.
7 Q Where is he from?
8 A New York. He's the sales officer in New York.
9 There has been a person by the name of Mark
10 Pizzi, who is the state officer in New York.
11 MS. FREEMAN: Did you say Joseph Pizzi
12 before?
13 MR. COULOH: Yes. I will ask that
14 later.
15 BY MR. COULOH:
16 Q Anybody from Maryland?
17 A I don't recall anybody from Maryland.
18 Q Have you ever discussed with Mark Pizzi the
19 issue involving agent defection?
20 A Yes.
21 Q You have testified that Mr. Devey was on
22 conference calls where that has been discussed?
23 A Yes.
24 Q What about Mr. Berman?
25 A Roy is the sales officer in PA, Pennsylvania.

PAGE 158

158

1 And there is a gentleman by the name of Dan
2 Whaley who is in PA. They have been on the
3 teleconferences from time to time as well.
4 Q And can you tell me whether or not during any of
5 those telephone conversations you have discussed
6 ideas to prevent agents from defecting in the
7 future?
8 MS. FREEMAN: Objection as to form.
9 Go ahead.
10 THE WITNESS: No.
11 BY MR. COULOH:
12 Q Have you ever discussed with anyone ways to keep
13 existing Nationwide agents from leaving?
14 MS. FREEMAN: Objection as to form.
15 Do you mean not with counsel?
16 BY MR. COULOH:
17 Q I just asked him if he has had discussions.
18 A Beyond the conversations that I have mentioned
19 today about that we're trying to say, remember,
20 don't overlook the good things that are
21 happening, and beyond procedures or steps, no.
22 Q Let me just be very specific on this.
23 A Okay.
24 Q Have you ever been in a meeting with Mr. Starr,
25 Mr. Crumrine, Mr. Barnes, or Mr. Ramsden where

PAGE 159

159

1 one of the topics of the discussion was, "how do
2 we stop defections?"
3 A Not that I can recall.
4 Q Has anyone from Columbus who is superior to you
5 ever said to you, "Why are all these agents in
6 Connecticut leaving?"
7 A Yes.
8 Q Who has asked you that question?
9 A Tom Starr has asked me my opinion as to what is
10 happening. Tom Crumrine has asked me my opinion
11 about why it's happening. I don't recall
12 anybody else asking me my opinion.
13 Q And what did you tell Mr. Crumrine as to the
14 reasons why they were happening?
15 A What I remember saying is; one, they were very
16 upset with the reduction in commissions. I
17 think that has a lot to do with it. My opinion,
18 based on feedback from the agents, was that they
19 felt that the company had lost its direction.
20 So, I gave them that feedback. And then my
21 personal observation is that other companies
22 were coming in and giving these people, like, a
23 golden parachute, meaning paying them commission
24 levels that are just mind boggling, and offering
25 to give all types of monetary incentives. Those

PAGE 160

160

1 are basically the three things.
2 Q Did you discuss at all with either Mr. Crumrine
3 and Mr. Starr the fact that the prices for
4 Nationwide's auto product was not competitive in
5 Connecticut?
6 MS. FREEMAN: Objection as to form.
7 Go ahead.
8 THE WITNESS: I have relayed to them
9 that the agents are saying that they were
10 leaving because they felt that they were
11 not competitive.
12 BY MR. COULOH:
13 Q Have any existing agents ever expressed to you,
14 within the last six months, an opinion that the
15 price of Nationwide's auto product is not
16 competitive?
17 A Yes, on a regular basis.
18 Q Have agents in Connecticut ever, within the last
19 six months, expressed to you the opinion that
20 the price of Nationwide's homeowners product is
21 not competitive?
22 A Yes, sir.
23 Q And is that existing agents?
24 A It's both.
25 Q And do they do that frequently, infrequently?

NORRIS JOSEPH YOUNG, JR. - May 25, 2000

PAGE 161  SHEET 41

161

1    MS. FREEMAN: Objection as to form.
2    THE WITNESS: I'm not sure what --
3    it's a regular -- it's discussed a lot by
4    agents in any state at any time in any
5    year.
6  BY MR. COULOM:
7  Q    Have you made any investigation personally to
8    determine whether or not the price of
9    Nationwide's auto product is or is not
10    competitive of that offered by comparable
11    companies?
12    MS. FREEMAN: Objection as to form.
13    Go ahead.
14    THE WITNESS: Yes.
15  BY MR. COULOM:
16  Q    Have you made a study as to whether or not the
17    price of Nationwide's homeowners product is or
18    is not competitive with that offered by
19    comparable companies?
20  A    Yes.
21  Q    And in your investigation have you concluded
22    that the agents who have complained are totally
23    misguided?
24    MS. FREEMAN: Objection as to form.
25    Go ahead.

PAGE 162

162

1    THE WITNESS: Is there any other way
2    you can ask that question?
3    MR. COULOM: Would you read the
4    question back?
5    (* Question read)
6    THE WITNESS: It is a fact that there
7    are carriers whose premiums are less than
8    ours. There are carriers whose premiums
9    are much more than ours. So, is that
10    misguided?
11  BY MR. COULOM:
12  Q    Are you aware that Nationwide has announced a
13    price increase for its auto and homeowners
14    products to take place in the next few months?
15    MS. FREEMAN: Objection as to form.
16    Go ahead.
17    THE WITNESS: In Connecticut?
18  BY MR. COULOM:
19  Q    Yes.
20  A    Yes, I am.
21  Q    And what is your belief about that?
22    MS. FREEMAN: Objection as to form.
23    His belief about what?
24  BY MR. COULOM:
25  Q    I will rephrase the question. Have you

163

1    expressed any opinions about that price increase
2    to any of your superiors?
3  A    I do not recall any conversations that would say
4    that it's unjustified.
5  Q    Let me back up. Were you asked your opinion as
6    to whether or not Nationwide should increase its
7    auto and homeowners prices in Connecticut?
8  A    No.
9  Q    Were you upset when you were not asked?
10  A    No.
11  Q    Were you surprised when you heard that
12    Nationwide is going to be seeking a price
13    increase in Connecticut for auto and homeowners
14    products to take place in the next few months?
15  A    No.
16  Q    When does the price increase take affect?
17    MS. FREEMAN: Objection as to form.
18    Can he tell you for each one?
19  BY MR. COULOM:
20  Q    Yes.
21  A    According to the planned schedule, that would be
22    July 15th.
23  Q    And is that auto and homeowners both go up on
24    July 15th?
25  A    Yes.

PAGE 164

164

1  Q    So you were not asked in advance whether the
2    July 15 increase should or should not take
3    place?
4  A    That is correct.
5  Q    And you were not consulted about the magnitude
6    of the increase prior to the announcement?
7    MS. FREEMAN: Objection as to form.
8    Go ahead.
9    THE WITNESS: I have been in numerous
10    discussions on what's called rate making
11    process. So I don't want to give you the
12    impression that I was not involved in
13    this. I was not -- the numbers are the
14    numbers. Our loss ratios are going up.
15    The numbers are justified. That's what I
16    said earlier about justified. So, no, they
17    don't come to me and say, "do you want to
18    take five percent versus ten percent,"
19    because that's not how it works.
20  BY MR. COULOM:
21  Q    Have you expressed any opinions as to whether or
22    not it's a wise business decision from a sales
23    and marketing standpoint to effectuate the price
24    increases that have been announced for July
25    15th?

NORRIS JOSEPH YOUNG, JR. - May 25, 2000

PAGE 169   SHEET 43

169

```
 1            THE WITNESS:  I'm not aware of a
 2    specific agent.  I'm aware of the fact
 3    that, as with any pilot, what happens is
 4    lists are supposed to be what's called
 5    scrubbed.  Meaning, this is the portfolio
 6    that I'm servicing.  And for all those
 7    portfolios together, they're supposed to
 8    secure lists and then purge them to make
 9    sure that those people aren't in there.
10    From what I understand happened is they did
11    mail it to somebody that was a current
12    insured of an agent.  When they researched
13    it they found out that that person's
14    address was a P.O. Box.  So, even though he
15    was insured with an agent, his address was
16    a P.O. Box.  At that point they were not
17    scrubbing for P.O. Boxes.  Once they
18    learned that, these things jumped up and
19    surfaced.  Now it's my understanding that
20    they scrub for P.O. Boxes.  So, in my
21    opinion it was not a blatant attempt to
22    hurt anyone.  It was part of why you have
23    pilots.  That's why that's not floating
24    around.
25 BY MR. COULOM:
```

PAGE 170

170

```
 1 Q   Did it happen?
 2            MS. FREEMAN:  Did what happen?
 3 BY MR. COULOM:
 4 Q   Did Nationwide solicit customers of an existing
 5    Nationwide agent and offer them an insurance
 6    product at a lower price in Texas?
 7            MS. FREEMAN:  Objection as to form.
 8            THE WITNESS:  I do not know that for a
 9    fact.  As I just said I believe that it did
10    happen.  And it was because of the P.O.
11    Box, which has been corrected.
12 BY MR. COULOM:
13 Q   And do you know if it happened in Illinois or
14    Indiana?
15 A   I have not heard of any problems that have
16    surfaced anywhere else.  And normally, you hear
17    about the problems.  You normally don't hear
18    about the good things.  I have not heard that.
19 Q   Have you ever heard the phrase cannibalization
20    effects of direct sales?
21 A   Not particularly.
22 Q   No one has ever used that phrase in your
23    presence?
24 A   Not in that way, that I'm aware of.
25 Q   Do you think you know where I'm coming from when
```

PAGE 171

171

```
 1    I'm talking about cannibalization effects of
 2    direct sales?
 3 A   I think so --
 4            MS. FREEMAN:  Objection as to form.  I
 5            think you need to give him a definition.
 6 BY MR. COULOM:
 7 Q   Your objection is noted.  You may answer.
 8 A   I believe that I know what you are referring to,
 9    but I'm not sure.
10 Q   Tell me what you think I'm referring to.
11            MS. FREEMAN:  Objection as to form.
12            Go ahead.
13            THE WITNESS:  I would believe you are
14            talking about the potential of taking
15            something from somebody.  That's the way I
16            would interpret cannibalism.
17 BY MR. COULOM:
18 Q   Taking what from whom?
19 A   For example taking a policyholder that an agent
20    is servicing and getting paid servicing fees.
21    Keeping it simple.
22 Q   That's what I was referring to.  Have you ever
23    heard that phrase in conjunction with direct
24    sales?
25 A   I have not.
```

PAGE 172

172

```
 1 Q   Okay.
 2            MS. FREEMAN:  So now we're going to
 3            talk about cannibalism?
 4 BY MR. COULOM:
 5 Q   Have you ever read any agency defection plans?
 6            MS. FREEMAN:  Objection as to form.
 7            THE WITNESS:  I'm not sure if I
 8            understand what an agency defection plan
 9            is.
10 BY MR. COULOM:
11 Q   You don't know what an agency defection plan is?
12 A   No.
13 Q   What do you think an agency defection plan is?
14 A   I don't know what you are referring to.
15 Q   Have you ever seen a reflex response tool box?
16 A   Yes, I have.
17 Q   And tell me how you saw that?
18 A   A copy was sent to me.
19 Q   And when it was sent to you, who sent it to you?
20 A   If I'm not mistaken it was either Bob Leo or
21    somebody who works for him.
22 Q   Did it come with a cover letter?
23 A   I don't remember one, but it would seem to make
24    sense that something was attached that says
25    here's what this is.
```