# Exhibit
# 3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
* * * * * * * * * * * * * * * *
                              *  CASE NO.  3:99CV2005 WWE
NATIONWIDE MUTUAL INSURANCE,   *
COMPANY, NATIONWIDE MUTUAL FIRE *
INSURANCE COMPANY, NATIONWIDE  *
LIFE INSURANCE COMPANY, and    *
NATIONWIDE PROPERTY AND CASUALTY*
INSURANCE COMPANY,             *
          PLAINTIFFS,          *
                              *
VS.                            *
                              *
PATRICIA A. BLAND, ET AL.,     *  VOLUME II
          DEFENDANTS.          *
                              *
* * * * * * * * * * * * * * * *
```

--------------------------------------------------------
     CONTINUED DEPOSITION OF:  STEVEN T. MILES
--------------------------------------------------------

          Taken before Irene A. Janazzo,
     Registered Professional Reporter, Lic./Reg.
     No. 00085, and Notary Public in and for the
     State of Connecticut, pursuant to the Federal
     Rules of Civil Procedure, at the offices of
     Robinson & Cole, L.L.P., One Commercial Plaza,
     Hartford, Connecticut, on January 20, 2000,
     commencing at 10:20 a.m.

          SMITH REPORTERS, INCORPORATED
               Post Office Box 154
             Bristol, CT  06011-0154
               Tel:  (860) 585-0764
               Fax:  (860) 585-6341

1        former agents?

2                MS. FREEMAN:  Objection as to form.

3    A    I'm not aware of that.

4    BY MR. COULOM:

5    Q    Has anybody ever told you or have you heard

6         statements that Nationwide said they would bury

7         Mr. Donaldson?

8                MS. FREEMAN:  Objection as to form.

9    A    I don't know if it was a comment like that.

10   BY MR. COULOM:

11   Q    What was the comment like that you're thinking

12        of?

13   A    I think it was more like a football comment,

14        that playing a game of football you'll say that

15        we're going to kill our competition or beat our

16        competition.  I think it was probably said that

17        way.  "We're going to beat Donaldson."

18   Q    What were the words that were used?

19   A    I don't recall.

20   Q    Who said them or who --

21   A    I believe that was Joe Young.

22   Q    Joe Young made a comment --

23   A    But I don't think it was made specifically to

24        Donaldson.  I think it was just in general.

25   Q    Who did Mr. Young make this comment to?

Miles                                                                252

```
 1    A    To me.

 2    Q    And what did he say?

 3    A    As I said before, I wasn't sure exactly what it

 4         was, but it was something along the lines of,

 5         "We're going to beat these guys.  We're going

 6         to win," that way.

 7    Q    He didn't use the phrase "we're going to bury

 8         them"?

 9    A    I don't remember the phrase "we're going to

10         bury them" at all.

11    Q    Did you ever hear the words "we'll cut them off

12         at the knees"?

13    A    Yes, I did.

14    Q    Where did you hear that?

15    A    I heard that in a discussion with Mr. Young

16         that someone had said he said that.

17    Q    And what did he say?

18    A    He said, "I better watch what I say because

19         they'll probably take this in the wrong way

20         that it was not meant."  And he said to me the

21         same thing that I mentioned before on a

22         football phrase, that when you want to beat

23         somebody you want to kill the person or

24         whatever, but that's not what it means

25         literally.
```

1    Q    So he didn't deny making statements along those

2         lines?

3              MS. FREEMAN:  Objection as to form.

4         Along what lines, "cut off at the knees"?

5              MR. COULOM:  He can answer.

6    A    He made that comment to me, something along

7         those lines.

8    BY MR. COULOM:

9    Q    And he thought he was misinterpreted.  Is that

10        what you're saying?

11             MS. FREEMAN:  Objection as to form.

12        How can he say what Mr. Young thought?

13   A    I think what you're trying to say -- he said

14        that in a way that we were going to win, that

15        we were going to do what we had to do to win

16        the case to save our business.  It could have

17        meant anything.

18   BY MR. COULOM:

19   Q    Is it Renas or Arias?

20   A    Arias.

21   Q    How long has Ms. Arias held an appointment to

22        sell insurance on behalf of Nationwide?

23   A    I don't know.

24   Q    Now, as part of the action, is there a specific

25        procedure that is to be followed in terms of

1           retrieving information when an agent announces

2           that they are leaving?

3                   MS. FREEMAN:  Objection as to form.

4               You mean the reflex action plan?

5                   MR. COULOM:  Yes.

6      A    All we do in the reflex action plan is when

7           we're informed that someone is leaving us, on

8           our Lotus Notes we notify I think there's eight

9           or 10 people that are critical in generating

10          lists, shutting equipment down, making --

11          pulling information off the systems, things

12          like that, getting letters ready to be sent to

13          our policyholders explaining that the former

14          agent had left, that type of thing.

15     BY MR. COULOM:

16     Q    Are there any special procedures that have been

17          adopted to deal with the retrieval of

18          information from former agents?

19                  MS. FREEMAN:  Objection as to form.

20              He's not here as Nationwide.  He can tell

21              you what his experience is.

22                  MR. COULOM:  He can do that.  You're

23              right.  Your objection is noted.

24     A    I don't know of any way of specially -- how

25          they retrieve information or anything else.

1    BY MR. COULOM:

2    Q    Well, who goes -- whose job is it to get

3         materials back from former agents?

4    A    The sales manager.

5    Q    And how many times have you done that in the

6         last two years?

7    A    Five times, I believe.

8    Q    And have any special procedures for doing that

9         been enacted since 1998?

10   A    No, same ones we've always used.

11            MR. COULOM:  And let's mark this as

12         one exhibit.  Actually, let's mark them

13         separately.

14

15                    (Miles Exhibit No. 72, letter

16                    of obligations, 9/3/99, marked

17                    for identification.)

18

19                    (Miles Exhibit No. 73, notice

20                    of agent's cancellation of

21                    agreement, 9/3/99, marked for

22                    identification.)

23

24   BY MR. COULOM:

25   Q    I show you Exhibit 72 and ask if you can

1                      JURAT

2     * * * * * * * * * * * * * * * *                    ORIGINAL

3     NATIONWIDE MUTUAL INS. CO., ET AL.

4     vs.                          January 20, 2000

5     PATRICIA A. BLAND, ET AL.

6     * * * * * * * * * * * * * * * *

7

8          With the addition of the changes, if
      any, indicated on the errata sheet, the
9     foregoing is a true and accurate transcript
      of my testimony given in the above-entitled
10    action on January 20, 2000.

11                          _____
                                  STEVEN T. MILES
12

13         Subscribed and sworn to before me,

14    the undersigned authority, on this the

15    _1st_ day of _March_ , 2000.

16    _Sandra S. Popalardo_
17    Notary Public

18    My commission expires: 2/28/04

19

20

21

22

23

24

25

1  ### CERTIFICATE OF REPORTER

2  I, Irene A. Janazzo, a Notary Public duly

3  commissioned and qualified in and for the State of

4  Connecticut, do hereby certify that pursuant to notice,

5  there came before me, on the 20th day of January, 2000, the

6  following named person, to wit:  STEVEN T. MILES, who

7  was by me duly sworn to testify to the truth and nothing

8  but the truth; that he was thereupon carefully examined

9  upon his oath and his examination reduced to writing under

10  my supervision; that this deposition is a true record of

11  the testimony given by the witness.

12  I further certify that I am neither attorney nor

13  counsel for, nor related to, nor employed by any of the

14  parties to the action in which this deposition is taken

15  and further that I am not a relative or employee of any

16  attorney or counsel employed by the parties hereto, or

17  financially interested in the action.

18  IN WITNESS THEREOF, I have hereunto set my hand

19  and affixed my seal this 27th day of January, 2000.

20

21  _Irene A Janazzo_

22  Irene A. Janazzo
   Notary Public, Lic. No. 00085

23  My commission expires:  December 31, 2003

24

25

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

```
* * * * * * * * * * * * * * *  *
                               *  CASE NO. 3:99CV2005 WWE
NATIONWIDE MUTUAL INSURANCE,    *
COMPANY, NATIONWIDE MUTUAL FIRE *
INSURANCE COMPANY, NATIONWIDE   *
LIFE INSURANCE COMPANY, and     *
NATIONWIDE PROPERTY AND CASUALTY*
INSURANCE COMPANY,              *
          PLAINTIFFS,           *
                                *
VS.                             *
                                *
PATRICIA A. BLAND, ET AL.,      *
          DEFENDANTS.           *
                                *
* * * * * * * * * * * * * * *  *
```

---------------------------------------------------------------------

DEPOSITION OF:  STEVEN T. MILES

---------------------------------------------------------------------

Taken before Irene A. Janazzo,
Registered Professional Reporter, Lic./Reg.
No. 00085, and Notary Public in and for the
State of Connecticut, pursuant to the Federal
Rules of Civil Procedure, at the offices of
Robinson & Cole, L.L.P., One Commercial Plaza,
Hartford, Connecticut, on January 19, 2000,
commencing at 10:25 a.m.

ORIGINAL

SMITH REPORTERS, INCORPORATED
Post Office Box 154
Bristol, CT  06011-0154
Tel:  (860) 585-0764
Fax:  (860) 585-6341

1    Q    And how old are you?

2    A    Forty-four.

3    Q    What's your date of birth?

4    A    5/3/55.

5    Q    Now, can you give me your -- just a thumbnail

6         of your job history, let's say, from '74 to

7         '80.  Do the best you can.

8    A    '74 to '80?  I think I was in real estate in

9         '74.  Then I started as a Nationwide agent in

10        January of '76, and I've been with Nationwide

11        ever since.

12   Q    So you've been associated or employed by

13        Nationwide since 1976?

14   A    Yes.

15   Q    Could you just tell me what your

16        relationship -- different relationships have

17        been with Nationwide starting from the

18        positions you held in 1976.

19             MS. FREEMAN:  You have to let him

20             finish the question even though you know

21             what he's going to say.

22             THE DEPONENT:  Sorry.

23             MS. FREEMAN:  It's okay.

24   A    In 1976 I was an NDP which is a new agent for

25        Nationwide.  It's a training program.  In 1978

Miles                                                           7

1        I became a career agent or an independent

2        contractor with Nationwide.  1979 I became what

3        they call a special agent for Nationwide which

4        is someone in management training essentially.

5        1980 I became a district sales manager for

6        Nationwide and have held that position with

7        name changes through last November where I'm

8        now the growth sales manager for Nationwide.

9   BY MR. COULOM:

10   Q    When did you become growth sales manager?

11   A    Actually, it was supposed to take effect 4/1,

12        but it was probably 1/1 of this year.

13   Q    When did you learn that you would become growth

14        sales manager for Nationwide?

15   A    Sometime in December, mid-December, 17th, 18th

16        of the month.

17   Q    And who told you that?

18   A    Joe Young who's my boss.  He's the sales

19        officer.

20   Q    Who took your place as district sales manager?

21            MS. FREEMAN:  Objection as to form.

22   BY MR. COULOM:

23   Q    You can answer.

24   A    There is no one who took that position.  It's a

25        change.  Nationwide has changed the way that

```
1    A    No.

2    BY MR. COULOM:

3    Q    Have you ever heard that Nationwide will use

4         its substantial resources to do whatever it

5         takes to keep business?

6              MS. FREEMAN:  Objection as to form.

7    A    I don't believe so.

8    BY MR. COULOM:

9    Q    You never anything like that?

10   A    I've heard things like that but not the way you

11        phrased it.

12   Q    What have you heard that's like that?

13             MS. FREEMAN:  Objection as to form.

14   A    I've heard comments made that we do not wish to

15        lose any premium, and we'll spend whatever

16        money it takes to retain our premium.

17   BY MR. COULOM:

18   Q    And who have you heard say that?

19   A    My boss said that.

20   Q    What's his name?

21   A    Norris Young, Joe Young.

22   Q    And who else have you heard say that?

23             MS. FREEMAN:  Objection as to form.

24   A    I don't think I've heard anyone else say that.

25   BY MR. COULOM:
```

1                           question.)

2

3      A      It wouldn't make a lot of sense to me.  I don't

4             think it would be appropriate.

5                     MR. COULOM:  We can take a break.

6

7                     (A short break was taken.)

8

9      BY MR. COULOM:

10     Q      Mr. Miles, how many agents, to your knowledge,

11            terminated their contracts with Nationwide in

12            1998?

13                    MS. FREEMAN:  Objection as to form.

14            Do you want to give him a specific

15            location?

16                    MR. COULOM:  In Connecticut.

17     A      I'm not aware of how many terminated in 1998.

18     BY MR. COULOM:

19     Q      Can you tell me the names of the people you can

20            think of who left in 1998.

21     A      Again, I'm not sure it's 1998.  There was

22            somebody by the name of Cuocco.  1998?  I think

23            that's all I can think of in 1998.

24     Q      Who can you think of in 1999 who resigned, or

25            terminated or canceled their agent's contract

Miles                                                    178

1              with Nationwide?

2    A    Savacool.

3    Q    How do you spell Savacool?

4    A    I believe it's S-A-V-A-C-O-L-E.

5              MS. FREEMAN:  It's C-O-O-L.

6    A    C-O-O-L.

7  BY MR. COULOM:

8    Q    Who else?

9    A    Obviously Bland, Mortensen, Donaldson, Royko,

10        R-O-Y-K-O, Jeavons, I think Warner.

11   Q    How do you spell that?

12   A    W-A-R-N-E-R.  That's all I can think of right

13        now.

14   Q    How about somebody named Daigle?  Does that

15        mean anything to you?

16   A    Yeah, but he didn't cancel in 1999.

17   Q    In 1998?

18   A    I think even before then.

19   Q    It was before 1998?

20   A    I'm not sure.  I had nothing to do with that

21        agent.  I thought it was longer than that.

22   Q    How about someone named Loda?

23   A    I don't know if he retired or if he's left or

24        not.

25   Q    Were any agents terminated involuntarily or

Miles

179

1    fired in the last two years?

2  A   There was one other agent who left in '99 I

3      just thought of, and that was Ed McMahon.

4      Agents who were fired?  I don't know how these

5      people left.

6  Q   Which people would that include?

7  A   Loda you mentioned, Savacool.  I think they

8      were retirements, but I don't know that for a

9      fact.  They were in another district.  So I

10     would have nothing to do with them.

11 Q   What about Kapatoes?

12         MS. FREEMAN:  He wasn't an agent.

13 BY MR. COULOM:

14 Q   How about in 2000?  What agents have left in

15     2000?

16 A   2000?  Diane Deming, Bonnie Johnson, Bob Bokus,

17     and I think that's it.

18 Q   Any others that you can think of?

19         MS. FREEMAN:  For any of the years?

20 A   For any years?

21 BY MR. COULOM:

22 Q   Well, the last three years.

23 A   No one comes to mind.

24 Q   Mr. Cuocco, do you know what town he was in?

25 A   I know he was on the shore.  It might have been

1          the Old Saybrook area, somewhere around there.

2     Q    Did Nationwide bring an action against him?

3     A    I don't know.  He was not one of my agents.

4     Q    Mr. Royko, under what circumstances did

5          Mr. Royko leave?

6     A    Mr. Royko resigned.

7     Q    Was there an agreement between Nationwide and

8          Mr. Royko pertaining to his resignation?

9               MS. FREEMAN:   Objection as to form.

10    A    I don't know what you mean by that.

11   BY MR. COULOM:

12    Q    Was there some form of settlement agreement

13         between Nationwide and Mr. Royko?

14    A    Not that I'm aware of.

15    Q    Has Nationwide agreed not to sue Mr. Royko?

16    A    No.

17    Q    Does -- has Nationwide brought a lawsuit

18         against Mr. Royko?

19    A    I don't believe there's one brought against him

20         as of yet.

21    Q    When did he resign?

22    A    I think it was three or four days after these

23         three agents resigned.

24    Q    So he resigned in late August or early

25         September of '99?

Miles                                                        181

```
 1    A    No.  I think it was September 4th, something

 2         like that.

 3    Q    September 4th of 1999?

 4    A    Um-hum.

 5    Q    And is there a reason -- you say a lawsuit, you

 6         don't believe, has been brought against him as

 7         yet.  Are you contemplating suing Mr. Royko?

 8    A    That's not my --

 9              MS. FREEMAN:  Objection as to form.

10    A    That's not my decision.

11  BY MR. COULOM:

12    Q    Have you recommended that Mr. Royko be sued to

13         any of your superiors?

14    A    No, I have not.

15    Q    Do you think he's done anything wrong?

16              MS. FREEMAN:  Objection as to form.

17    A    Yes, I do.

18  BY MR. COULOM:

19    Q    What do you think he's done wrong?

20    A    He's gotten licensed with another company.

21         He's trying to rewrite our business.

22    Q    What else?

23    A    What else has he done wrong?  He continues to

24         solicit Nationwide customers.  I don't know

25         what else at this point.
```

1    Q    Has he given anything back to Nationwide?

2    A    He has not given us our files.  We have to get

3         those back.

4    Q    Why hasn't he given you files?

5              MS. FREEMAN:  Objection as to form,

6         calls for speculation.

7    A    I don't know why someone would keep something

8         that did not belong to them, but he did not

9         give them back.

10   BY MR. COULOM:

11   Q    Did Cuocco give files back?

12   A    As I said before, I wasn't familiar with that

13        case.  He wasn't in my district.  So I don't

14        know what he gave back.

15   Q    How about Jeavons?  When did Mr. Jeavons leave?

16   A    Mr. Jeavons left April 1st of 1999.

17   Q    Do you know if Nationwide has brought a lawsuit

18        against him?

19   A    No, they have not.

20   Q    Why not, to your knowledge?

21   A    He was the first agent that left, and we didn't

22        go after him.  He was a very small agent, and

23        we didn't think that we were going to have the

24        problems that we ended up having.  There were

25        so many agents considering leaving.

Miles                                               183

```
 1    Q    So the fact that several agents have left is a
 2         factor in your bringing these lawsuits?
 3    A    I think it would be.  We are not used to having
 4         agents leave us, and when groups of people
 5         decide to leave with millions of dollars of our
 6         premium, it becomes a real concern.
 7    Q    When Mr. Daigle left, did he give back files?
 8              MS. FREEMAN:  Objection as to form.
 9    A    Mr. Daigle was not in my district.  I don't
10         know what happened.
11 BY MR. COULOM:
12    Q    How about Mr. Loda?  Do you know if he's
13         returned policyholder files?
14              MS. FREEMAN:  Objection as to form.
15    A    Again, I don't know.  I think those are
16         retirements.
17 BY MR. COULOM:
18    Q    When you retire, do you not have to give your
19         files back?
20    A    You have to, and I know of no reason why
21         someone would not give them back.
22    Q    Well, if you retire and you don't give back
23         policyholder files, does Nationwide sue those
24         people?
25              MS. FREEMAN:  Objection as to form.
```

Miles                                                      191

1              MR. COULOM:  Have you read any

2      communications texts?

3              MS. FREEMAN:  Body language is a

4      communication?

5              MR. COULOM:  Yes.

6              MS. FREEMAN:  I don't think so.

7    A    I think Mr. Young assumes that we're going to

8         sue every agent that leaves us.

9    BY MR. COULOM:

10   Q    Why do you have that assumption?

11   A    Because he and I both were under the

12        understanding that we want the agents who leave

13        to give us back our property.  He and I both

14        believe that the files are our property.  Now,

15        in regard to these agents, if we were to lose

16        that it wasn't our property, then you asked the

17        question, well, why would you sue someone else.

18        We obviously wouldn't sue them if that had

19        happened.

20   Q    Is there a difference between the agents who

21        left in 1998 or in early '99 who were not sued

22        and the agents who left on or after August 31

23        of 1999 in terms of what they did right or

24        wrong?

25              MS. FREEMAN:  Objection as to form.

Miles                                    192

1    A    I don't have all the information on those other

2         agents.  As I said, I can only speak to the one

3         that was in my district, and that was the first

4         agent that left in my district.  I thought it

5         was an isolated case.  I didn't think we would

6         have any problem with that.  It was a very

7         small agent, and we were not threatened by the

8         loss of premium.  August 31st there was almost

9         5 million dollars of premium that was at stake,

10        and that made a difference.

11   BY MR. COULOM:

12   Q    That's just in Connecticut?

13   A    That's just in my district.

14   Q    Just in your district?

15   A    Right.

16   Q    In the states of New York, Pennsylvania,

17        Connecticut and Maryland, how much premium has

18        Nationwide lost as a result of agents

19        terminating and going into business in

20        competition with Nationwide?

21             MS. FREEMAN:  Objection as to form.

22   A    I don't know the answer to that.

23   BY MR. COULOM:

24   Q    Is it more than 20 million dollars?

25             MS. FREEMAN:  Objection as to form.

1              Don't guess.

2    A    I wouldn't know that.

3    BY MR. COULOM:

4    Q    What is your understanding of how many

5         independent contractor agents have left

6         Nationwide in the East since 1998?

7    A    I believe it's somewhere around 50 agents in

8         New York.

9    Q    How many in Maryland?

10   A    I have no idea if anyone left Maryland.

11   Q    How many in Pennsylvania?

12   A    I think that's a big number, too, somewhere

13        around 30 or 40 agents.

14   Q    Is it a fair statement that approximately a

15        third of the agents in your district have left

16        in the last two years?

17            MS. FREEMAN:  Objection as to form.

18   A    Well, let's see.  We had nine and I had 40

19        agents.  So it would not be a fair assessment.

20   BY MR. COULOM:

21   Q    So nine out of 40 left?

22   A    Yeah, so 23 percent.

23   Q    And that's just as of when?

24   A    As of yesterday.

25   Q    Why did Mr. Bokus leave?

1

2                    **CERTIFICATE OF REPORTER**

            I, Irene A. Janazzo, a Notary Public duly

3    commissioned and qualified in and for the State of

4    Connecticut, do hereby certify that pursuant to notice,

5    there came before me, on the 19th day of January, 2000, the

6    following named person, to wit:  STEVEN T. MILES, who

7    was by me duly sworn to testify to the truth and nothing

8    but the truth; that he was thereupon carefully examined

9    upon his oath and his examination reduced to writing under

10   my supervision; that this deposition is a true record of

11   the testimony given by the witness.

12           I further certify that I am neither attorney nor

13   counsel for, nor related to, nor employed by any of the

14   parties to the action in which this deposition is taken

15   and further that I am not a relative or employee of any

16   attorney or counsel employed by the parties hereto, or

17   financially interested in the action.

18           IN WITNESS THEREOF, I have hereunto set my hand

19   and affixed my seal this 26th day of January, 2000.

20

21                        _Irene A. Janazzo_
                          _____
22                        Irene A. Janazzo
                          Notary Public, Lic. No. 00085

23   My commission expires:  December 31, 2003

24

25